DOANE COLLEGE, PLAINTIFF IN ERROR, V. JOHN LANHAM, DEFENDANT IN ERROR.

[FILED MAY 16, 1889.]

1. **Arbitration:** AWARD : WORK AND LABOR: SET OFF. J. L. contracted with Doane College to furnish the material and mechanical skill for doing the brick work of one of the halls or buildings of said college, and agreed to complete the said brick work, except topping the chimneys, on or before July 1, next thereafter, and to forfeit to said college of his compensation for such material and mechanical skill, one hundred dollars for each week, which he should overrun his time in the completion of said work. The work not having been done in time, and certain differences and disagreements having arisen between J. L. and the building committee of Doane College, including the amount of forfeiture under said agreement, and the parties having agreed to submit to arbitration "some points and items

of difference existing between said parties as to work to be done, material to be furnished, damage for alleged delay, etc," before entering upon the arbitration, the following memorandum was entered upon the agreement to submit as expressing the points and differences submitted: "Memorandum—The matters are: stone for, freight upon, and setting, stone steps, and damages for delay in completing contract beyond July 15." The arbitrators made the following award: "First, Lanham to be relieved of the steps entirely. The college to do that work at their own expense. Second, no change to be made in estimate already made in brick-work done in basement around windows. Third, Lanham to pay Doane College the actual loss at rate of $1.87½ per room per week, for each of the thirty rooms mentioned in Mr. Doane's statement, counting from beginning to end of fall term, rent on all rooms not occupied:

| | |
|---|---:|
| Total amount | $675.00 |
| Fourth, Lanham to pay Doane College twelve weeks' service of J. W. Malone at $35.50 | 426.00 |
| Loss freezing cistern water, etc. | 100.00 |
| Total | $1,201.00 |
| Deduct from penalty five days at rate $100 per week | 81.66 |
| Total amount to be taken from contract price | $1,119.34 |

An action being afterwards brought by J. L. against Doane College for mechanical skill, work, labor, and material furnished by him under the said contract for the erection of the said building, and for additional mechanical skill, work, and labor, rendered necessary in the erection thereof by reason of changes in the height and plan of said building, and Doane College having answered in said action, setting up the submission of said points and matters of difference between the said parties, to arbitration, the award of said arbitrators thereupon, which found that there was due to the said Doane College the sum of eleven hundred and nineteen dollars and thirty-four cents, and that thereupon the said Doane College did tender to said J. L. "the balance his due, of which the said" J. L. "took all except the sum of one hundred and twenty and twenty-one one-hundredths dollars, and which the said Doane College now owes the said" J. L., "which they have often tendered him, * * * which amount he refuses to accept, and the said college now presents said amount of money in court," etc.: *Held*, That the said award be sustained as a counter claim or set-off in favor of Doane College and against the claim of J. L. to the extent and amount of $593.34, and no more.

2. **Work and Labor:** TRIAL: EVIDENCE. The contract was for putting up the masonry of Ladies' Hall, and furnishing all the brick and lime, cement and water, and all the labor necessary and of such quality as to put up the building in good workmanlike manner in the shortest time possible, consistent with good work, etc., with all the ordinary specifications as to the manner of doing the work and providing the manner of measuring the same, and providing for paying for the same, when completed and accepted, at the rate of $10 per 1,000 of brick where the walls have one side of the repressed brick, which was to include chimneys, and $12 per 1,000 where the walls have two sides of repressed brick; also for paying in addition to the price named, seventy-five cents per 1,000 of bricks for all brick masonry laid in mortar made in part with hydraulic cement, etc. There being neither plan nor drawing of said building showing the height thereof, exhibited to the contractor, nor present at the time or previous to the entering into said contract, nor any specification or clause in said contract, stating or indicating the height of which said building was to be, nor the number of stories it was to contain; and there being evidence on the trial tending to prove that the contractor, without inexcusable negligence on his part, entered into the said contract in the honest belief and expectation that the brick walls of said building were to be, and that he would be required to build them, only two stories high; and there being also evidence tending to prove that the mechanical skill and labor necessary to build and erect the brick-work of the third story of the three-story walls and building, which, by the building committee of the defendant under the said contract, the contractor was required to and did actually build for the defendant, was actually worth at the rate of three dollars per thousand brick for one hundred and eighty-nine thousand, four hundred and one bricks, more and in excess of the average of that required to build and erect the same building of two stories in height only; there also being evidence tending to prove that said contract was entered into by both of the parties in view of the said building being erected upon a foundation and foundation walls then being constructed under another and separate contract by the said J. L., without change in the shape or character of the walls thereof, but that before the erection of the brick-work of said building, the plan and character of said foundation was changed from plain corners to buttressed corners; that said contractor was required and did build the walls and brick-work of said building to conform to said foundation so changed at an additional cost of skill, mechanical work, and labor, to the contractor, of the sum of thirty dollars; and there being evidence

tending to prove the laying and placing in the walls of said building by the contractor, of a number of thousands of brick and a quality and kind of workmanship that under the terms of the said contract would amount to a sum which, added to the amount of compensation for the extra work as above set out and stated, and after deducting all moneys paid to the contractor under said contract and the amount of defendant's counter claim or set-off, allowed as above stated, would still leave an amount due to the contractor above the amount of the verdict: the verdict is sustained and judgment affirmed.

ERROR to the district court for Saline county. Tried below before BROADY, J.

*Dawes & Foss*, for plaintiff in error, cited: *Mills v. Miller*, 4 Neb. 444; *Coffing v. Taylor*, 16 Ill. 457; *Congregational Society v. Perry*, 6 N. H. 164; *Brown v. Bellows*, 4 Pick. (Mass.) 192; *Chase v. Strain*, 15 N. H. 535; *U. S. v. Packages*, 17 Howard, 96; *De Castro v. Brett*, 56 How. Pr. (N. Y.) 484; *Perkins v. Giles*, 50 N. Y. 228; Morse, Arbitration and Award, 171, 172; 6 Wait's Act. & Def. 526.

*Abbott & Abbott*, for defendant in error, cited: *Hall v. Vanier*, 6 Neb. 85; *McDowell v. Thomas*, 4 Id. 544; *Buntain v. Curtis*, 27 Ill. 374; *Johnson v. Noble*, 38 Am. Dec. 485; *Stewart v. Cass*, 42 Id. 534.

COBB, J.

This action was commenced in the district court of Saline county, by John Lanham against Doane College. The plaintiff in his petition alleges that Doane College is a corporation under the laws of this state; that on or about April 10, 1884, he contracted with the college through Thomas Doane, its legally authorized agent, to furnish the material and labor and to build and complete for Doane College the brick-work for a college building then being built for defendant on its grounds at Crete, Nebraska, and

known as Ladies' Hall; that it was then and there agreed between the parties that the price of said labor and material should be: for brick laid in the wall with mortar mixed partly with cement, and with both sides of wall faced with repressed brick, $12.75 per one thousand brick; that chimneys should be computed as solid, and each cubic foot of such masonry, including door and window openings, should be computed to contain two hundred and twenty-four and one-half bricks; that it was then and there verbally agreed by and between said parties that said work should be built on a foundation the dimensions of which were then determined, and should be two stories high, with plain outer walls, similar to those of the college building then standing on said grounds, and should contain as nearly as could then be estimated, a total of 275,000 brick; that subsequently and after said work was commenced, the plan was so changed by defendant as to make the main part of said building three stories high, instead of two as originally agreed upon, with outer walls buttressed instead of plain; that the plaintiff, without any agreed price therefor, did, at the request of defendant, proceed to furnish the labor and material and build and complete the third story, and the outer walls with buttresses instead of plain, according to said change of plan; that said third story contains the amount of 195,000 brick; that the first and second stories contain the total amount of 275,000 brick, all of which is laid in mortar mixed with cement, according to contract; that of said 275,000 brick, two-thirds are faced on both sides with repressed brick, and the plaintiff, according to said contract is entitled for building the same to the sum of $12.75 per thousand; that the remainder, or one-third part thereof, were faced on one side with repressed brick, and the price of laying the same, according to the contract, is $10.75 per thousand. The plaintiff alleges that the extra expense of laying the third story over those of the first and second, amounts to $3 per thousand, and that to furnish

material and labor and to build the third story of said building was worth $15.75 per thousand of brick for walls faced on both sides with repressed brick, and $13.75 per thousand for walls with one face of repressed brick laid in mortar mixed with cement, as stated; and that of the 195,000 brick laid in the third story of said building, 75,000 were faced with repressed brick on both sides, and 120,000 were so faced on one side; that all are laid with mortar properly mixed with cement; that the labor necessarily employed on the outer walls, buttressed instead of plain, is worth the sum of $15; and that the labor and material expended in the erection of the third story and the change in the outer walls amounts to $2,846.25. The plaintiff alleges that the total labor and material for the completion of the brick-work, according to the contract price for the first and second stories, and the actual value of labor and material for the third story, amounts to $6,170.50, furnished at the request and under the direction of defendant, completed September 1, 1884, and was accepted by defendant, whereby the defendant was and is liable to the plaintiff for the full amount thereof.

The plaintiff alleges that there has been paid him on said work by the defendant the sum of $3,740, and no more, and that there is due the sum of $2,430.50, and that though said last-mentioned sum has been due since September 1, 1884, the defendant has neglected to pay the same or any part thereof; wherefore the plaintiff prays judgment therefor with interest thereon from September 1, 1884, and costs.

Doane College, by its answer, denied all the allegations of the petition except those in the answer expressly admitted.

For a second defense it admitted that it entered into a contract with John Lanham, April 10, 1884, for the erection of a building upon the college grounds, to be known as "Ladies' Hall;" that said contract was in writing, a

copy of which is made exhibit "A" to its answer; that it contains no provision as to the height or number of stories of the building; that it provides for all the work thereon at the agreed prices set forth therein, and denies that there was any other contract than that set forth in exhibit "A;" and further denies that there was any verbal contract changing, modifying, or enlarging it, as alleged in the plaintiff's petition, but avers that all of the work done by the plaintiff on said building was at the contract price as set forth in exhibit "A;" that upon the completion of the building, the matters in controversy between the contractor and the college, as to the completion of the building, were placed before and considered by the building committee of said college, which refused to pay the same; and that finally all the matters of difference between the parties were submitted to arbitration, in writing, a copy of which is made exhibit "B" to its answer; that in pursuance of said submission, J. J. Butler, T. E. Calvert, and J. H. Ames, arbitrators, made and published their award that there was due to the said Doane College the sum of $1,119.34, which is made exhibit "C" to its answer; that the college then tendered the contractor the balance due him, which was accepted, except the sum of $120.21, which is now tendered him, and brought into court.

The defendant further avers that the amounts which were due the plaintiff as contractor and builder, were as follows:

| PART OF BUILDING. | BRICKS, M. | PRICE. |
|---|---|---|
| Center house | 141,701 | $1,608 80 |
| Stair halls, two ends and south side | 72,188 | 829 01 |
| East wing | 112,382 | 1,214 08 |
| West wing | 111,967 | 1,286 26 |
| Ladies' porch | 3,011 | 38 08 |
| Gents' porch | 5,381 | 68 02 |
| Rear porch | 3,880 | 49 09 |
| Total | 450,510 | $5,093 34 |

| | | |
|---|---:|---:|
| Amount reserved on foundation work (voucher No. 66)....... | $300 | 00 |
| Stone foundation of steps, 11.18 perch @ $3.50.................. | 39 | 13 |
| One stone window sill used in gas house........................... | 2 | 75 |
| 1,250 brick used in cistern @ $8 per thousand.................... | 10 | 00 |
| Fifty-three hours' work of younger Chowins, @ 25c per hour......................................................................... | 13 | 25 |
| Putting date of 1884 in brick work................................... | 15 | 00 |
| Ten per cent interest on Chowin's labor............................. | 1 | 33 |
| Total.......................................................................$5,474 | 80 |

That there was paid to the plaintiff the following sums:

| | | |
|---|---:|---:|
| June 10, voucher No. 50.................................................... | $586 | 50 |
| July 10, voucher No. 59................................................... | 1,153 | 45 |
| August 11, voucher No. 84................................................ | 782 | 00 |
| September 16, voucher No. 119........................................... | 1 | 75 |
| September 20, voucher No. 129............................:............. | 1,173 | 00 |
| October 7, voucher 147 .................................................... | 9 | 51 |
| October 11, voucher No. 158.............................................. | 22 | 11 |
| October 18, voucher No 164............................................... | 400 | 00 |
| December 9, voucher No. 242 ............................................ | 3 | 28 |
| July 26, voucher No. 78, grading cellar............................... | 11 | 25 |
| August 2, voucher No. 79....:........................................... | 17 | 00 |
| August 23, voucher No. 96................................................ | 3 | 75 |
| December 13, voucher No. 257, painting wall, E. basement... | 8 | 50 |
| Nine and one-half barrels cement...................................... | 22 | 32 |
| One barrel of lime...........................................:............. | 1 | 25 |
| April 17, 1885, voucher No. 323, for brick work of Chowins, etc........................................................................... | 39 | 58 |
| Amount of award of referees ........................................... | 1,119 | 34 |
| Total.......................................................................$5,354 | 59 |

Leaving a balance due John Lanham, as hereinbefore stated, of $120.21, which amount has often been tendered, as before stated.

"*Exhibit 'A.'*—I, John Lanham, of Crete, Nebraska, mason, hereby agree to put up the masonry of 'Ladies' Hall,' so called, at Crete, Nebraska; to provide at my own expense all the brick, the sand, lime, cement, and water, and all the labor necessary, and of such quality as to put up the building in good workman-like manner, in the shortest time possible, consistent with good work, and to increase or di-

minish the working force to such extent as shall be deemed the best by the building committee of the said ' Ladies' Hall,' and to give said building committee power at short notice to discharge such men as seem to them incompetent or disobedient of orders. The brick walls on the exterior of the building, are to have an outer wall of two bricks, or two inches, an open air-space of about two inches, and two walls and the air-space together are to be laid accurately by line, both sides, to a thickness of fourteen inches, except as to the chapel and dining room, where, between doors and windows, there will be an additional inside thickness of pilasters of one brick, or four inches, making altogether eighteen inches.

"In the chapel the pilasters will be joined together over the windows and doors by arches of brick, but in the dining room the pilasters are to be built perpendicular from bottom of windows to ceiling, and the panels will have a cornice at top made by corbelling out the bricks. The outside of the brick exterior walls and chimneys is to have one course of four inches of repressed bricks all around, and the chapel and dining-room and the three porches, and the stair well to the top, are to have one course of four inches of repressed bricks, inside as well as outside. The bricks are to be suitable for the purpose every way, and are to be furnished in suitable quantities, quality, and at suitable times, so that the building may be pushed forward to completion in time for occupancy at the beginning of the autumn college term this year. I agree to provide at my own expense all necessary staging, to thoroughly fill the masonry with mortar. The mortar is not to have more than two parts sand to one part of lime and cement combined, and if the mortar so made shall not have sufficient strength, then the proportions of materials must be changed. The lime and cement are to be fresh made. The lime for mortar is to be slaked in large quantities, and kept constantly on hands for use, and, if required, one part of hydraulic

cement shall be used to two parts of lime, but the cement shall not be added except as used; and no mortar having cement in it shall be left over night and used afterwards. If the mortar made, as before stated, shall prove unsatisfactory, it must by proper changes be made satisfactory to the committee. All joints in repressed brick, whether outside or inside, are to be struck. John Lanham is to place in the brick-work all irons required. The outer and inner walls are to be properly tied together at distances to be fixed by the committee, and at the floors the outer and inner walls shall be joined and be solid clear through for a height of five courses of brick.

"This contract includes all brick-work necessary above the top of water-table course, and all the chimneys, etc., and all work done is to conform to plans furnished, and is to be done under the supervision of a master mason to be appointed by the building committee, and to their entire satisfaction and acceptance; contractor to provide water to wet bricks when required.

"The measurement of bricks shall include all window and door openings, but is not to include the two-inch air-space. Chimneys are to be measured solid. Pilasters are to be measured across their faces, plus their two edges or projections from the main walls. Twenty-two and a half bricks are to be reckoned to the cubic foot of masonry. The brick-work of the entire building, except the topping of chimneys, is to be completed on or before July 1, next. I, John Lanham, also agree to forfeit to the college $100 of my dues under this contract for each week I shall overrun my time in the completion of this work.

"The entire work embraced in this contract is to be properly protected by John Lanham at his own expense from rain and storms during the progress of the work, and he agrees to be held responsible for damage to the work till its completion and acceptance. Doane College hereby agrees to pay for the above-specified work, when accepted, at the

rate of $10 per 1,000 of brick where the walls have one side of repressed brick, which is to include chimneys, and $12 per 1,000 where the walls have two sides of repressed brick.

"Doane College also agrees to pay in addition to the prices named above, seventy-five cents per 1,000 of bricks for all brick masonry laid in mortar made in part with hydraulic cement, making $10.75 for the one part and $12.75 for the other part. Doane College also agrees to pay John Lanham $100 premium for each week of time saved in the completion of his part of the contract. Doane College will make payment to John Lanham under this contract on the 10th day of each month at the rate of 85 per cent on the amount of work done during the previous calendar month; and final payment will be made in one month from the time of the completion and acceptance by the building committee. The amount of money heretofore advanced to John Lanham for bricks is to be deducted from the first payment to be made under this contract.

"The college agrees to provide the necessary plans of the work to be done, and hereby reserves the right to annul this contract provided it is not, in the opinion of the building committee, performed on the part of John Lanham, and the payments then to be made him shall be determined by the said committee, and shall be a final adjustment of his claims.

"Any changes in this contract mutually agreed upon shall be made in writing and attached hereto. Lincoln, Nebraska, April 10, 1884.

"[Signed]       JOHN LANHAM.

"DOANE COLLEGE,

"<i>By Thomas Doane, Chair. Build'g Com.</i>"

"<i>Exhibit 'B.'</i>—Memorandum of agreement made this 11th day of December, 1884, between the Building Committee of 'Ladies' Hall,' Doane College, and John Lanham, contractor. Whereas, in the completion and proposed

settlement for said 'Ladies' Hall' under contract with Lanham, there are some points and items of difference existing between said parties as to work to be done, material to be furnished, damage for alleged delay, etc., which the said parties are unable to agree upon; now, therefore, it is agreed to submit the same to arbitration as follows :

"Each party to select one person, these two to select a third, the same to comprise a Board to whom shall be submitted all and any papers, facts, figures, statements, etc., bearing upon the matters in controversy, which shall then be considered and decided by said board of arbitration, the parties hereto agreeing to be bound by said decision, and not to appeal therefrom. Said matters to be taken up and brought to conclusion immediately.

"[Signed]          JOHN LANHAM.
"THOMAS DOANE,
"*Chairman Building Committee, Doane College.*"

"*Memorandum :* The matters of difference are stone for, freight upon, and setting, stone steps, and damages for delay in completing contract beyond July 15."

"*Exhibit 'C.'*—Memorandum—*First:* Lanham to be relieved of the steps entirely, the College to do that work, at their own expense.

"*Second:* No change to be made in estimate already made on account of brick-work done in basement around windows.

"*Third:* Lanham to pay Doane College the actual loss at rate of $1.87½ per room per week for each of the thirty rooms mentioned in Mr. Doane's statement, counting from beginning to end of fall term, rent on all rooms not occupied; total amount.................................... $675 00

"*Fourth:* Lanham to pay Doane College twelve weeks' service of J. W. Malone, at $35.50........    426 00
Loss, freezing cistern water, etc.....................    100 00

Total.......................................$1,201 00

Deduct from penalty 5 days, at rate of $100 per
  week..................................................    81  66

Total am't to be taken from contract price, $1,119  34
Arbitrators to be paid by College:

Fees $50.........JOHN H. AMES, ⎫
  "        .........J. J. BUTLER,   ⎬ *Arbitrators.*"
          T. E. CALVERT, ⎭

The plaintiff replied to the defendant's answer as follows:

First. ˙ That exhibit "A" to defendant's answer is not
a contract, but merely a memorandum upon which the con-
tract, which rested on parole, was based; that said memo-
randum merely describes the manner in which the work
was to be done, the price therefor, and the time in which
it was to be completed; that it nowhere pretends to give the
dimensions or height of the structure to be built, which
were as in the plaintiff's petition alleged.

Second. The plaintiff denies that the matters set up and
claimed by him were ever submitted to arbitration, or that
there was an arbitration of the same or any part thereof;
but that they are wholly unsettled, and that the amount
claimed is due him from the defendant.

*     *     *     *     *     *.     *     *     *

Fourth. That plaintiff denies each allegation of new
matter in the answer contained not herein specifically ad-
mitted or denied.

Fifth. That there was a pretended arbitration of some-
thing in the memorandum of submission mentioned, but
that it took into consideration matters not contained in nor
contemplated by said submission; that they refused to con-
sider matters proper for them to consider, which would have
been to the advantage of the plaintiff, if considered; that
they refused to hear the plaintiff in his own behalf, but
heard only the defendant; that the defendant presented to
them false and unjust accounts, which they allowed without
hearing the plaintiff or giving him an opportunity to be
heard, whereby the pretended arbitrament and award is

void in law, and the plaintiff prays judgment according to the prayer of his petition.

There was a trial to a jury with a verdict and judgment for the plaintiff. The cause is brought to this court on the following assignments of error:

" 1. The court erred in admitting testimony on behalf of the plaintiff.

" 2. In giving the second and third paragraphs of instructions asked for by the plaintiff.

" 3. For refusing to give the first, second, third, fourth, and fifth, instructions asked for by defendant.

" 4. In giving the first, second, third, fourth, and fifth, paragraphs of instructions on its own motion.

" 5. The verdict is contrary to the last-mentioned instructions of the court.

" 6. The verdict is not sustained by sufficient evidence.

" 7. The court erred in rendering judgment for the plaintiff and in not rendering it for defendant."

On the trial the plaintiff testified as a witness on his own behalf, over the objections of the defendant, that he made a contract with Mr. Doane about the 10th of April, 1884, for the erection of the brick-work upon Ladies' Hall at Crete, Nebraska; that there was a writing signed by him, and by Mr. Doane, on the part of the defendant. Witness recognized defendant's exhibit "A." as the writing, and admitted his signature thereto as genuine. The plaintiff's counsel asked the following question:

What was to be the height of that building mentioned in the written contract? [To which the defendant objected as irrelevant, immaterial, and incompetent, which objection being overruled, the plaintiff offered in evidence the. contract referred to as the defendant's exhibit "A," which was received without objection, and the witness answered:]

There was no height given in the contract; it was just verbally given. Mr. Doane met me in Lincoln, with the

contract in his possession, * * * * and told me he wanted me to sign that contract as it was written except as to the time of the completion of the building.

Q. State just the conversation between yourself and Col. Doane, at that time, about the size and height of that building and where it was to stand? [To which the defendant objected as immaterial, irrelevant, and incompetent, which objection was overruled, and exceptions taken.]

A. After the contract was written up, Mr. Doane asked me to go into bond to complete the building by the 15th of July. [To which the defendant objected as immaterial, irrelevant, and incompetent.]

Q. Give the dimensions of the building.

A. I asked Mr. Doane how much brick it would take, and he told me the approximate estimate would be 275,000. [The defendant objected that the answer was not responsive, which was overruled and exceptions taken.] Mr. Doane told me there would be 275,000 brick, and I based my figures upon what would be necessary to put the 275,-000 brick up, and no more.

Q. Where was the building to stand? On what foundation?

A. It was to stand upon the foundation we were then building; it was not then up.

Q. How many stories would 275,000 brick build on that foundation? [The defendant objected to the question as incompetent, and the witness not shown to be qualified. Overruled, and exception taken.]

A. If the building had been foot walls, as first talked of, the 275,000 would have built the two-story building.

Q. What thickness was specified?

A. I think the contract states.

Q. What did he say of the wall of the building—with what did he compare it?

A. He compared it as similar to Doane College.

Q. Merrill Hall?

A. Merrill Hall was similar to Doane College; that is a two story building.

Q. State what was said upon that subject? How was Merrill Hall built?

A. It was built plain, except the roof projection.

Q. How are the walls of Merrill Hall built?

A. There are some small projections at the top at the gutter.

Q. The brick transoms at the gutter all the way round, and the mansard from that up?

A. Yes, sir.

Q. How about the buttresses in Merrill Hall? [The defendant objected as immaterial, irrelevant, and incompetent. Overruled, and exception taken.]

A. There were no buttresses in Merrill Hall.

Q. How were the walls of Ladies' Hall building in that respect?

A. They were buttressed upon the north wing.

Q. When did you first learn that the building was to be three stories instead of two?·

A. I think about the 10th of July, if I remember aright.

Q. When were you first required to buttress those walls, instead of the building they planned?

A. That was at the start of the brick work.

Q. Before or after the signing of this paper?

A. I knew nothing about the buttress until after the signing of the paper.

Q. How much more was that worth to build those walls buttressed as they are instead of building them plain as upon Merrill Hall? [To which the defendant objected as immaterial, irrelevant, and incompetent, which objection was overruled, and exceptions taken.]

A. At each corner of the building there are four corners instead of one, and the building of those buttresses will take more time than to turn any ordinary corner, because every

one of them have to be plumbed separately. It is worth considerably more. I suppose for the amount of brick there is in it, it is worth four times what it is to build an ordinary corner.

Q. How much more is that labor worth?

A. Fifteen dollars per thousand to lay those buttresses.

Q. What is the total extra amount of labor to build those buttressed instead of plain?

A. That would be about thirty dollars.

Q. How many brick are there in the first and second stories of that building?

A. Two hundred and fifty-nine thousand, one hundred and forty-seven.

Q. How many in the upper or third story—total?

A. One hundred and eighty-nine thousand, four hundred and seventy-one.

Q. How much more per 1,000 is it worth to put those brick in the upper story than in the first and second stories?

A. Three dollars. [The defendant objected. Objection overruled, and exception taken.]

Q. When did you first learn that you was expected and required to build that building three stories high instead of two, according to the first contract?

A. On or about the 10th of July; it was in the beginning of July.

Q. Did you then go on and build this building three stories high?

A. I did.

Q. How many brick total did you put into that building?

A. Four hundred and fifty-eight thousand.

Q. How many in the first and second stories?

A. In the first and second stories, 311,984.

Q. In the third story?

A. One hundred and forty-six thousand, four hundred and twenty-one.

Q. Of the brick in the first and second stories, how many were faced both sides—were refaced brick?

A. One hundred and twenty-two thousand, five hundred and thirteen.

Q. That is, faced on both sides, were repressed brick?

A. Yes, sir.

Q. Was the balance faced at all?

A. Yes, sir; on one side were repressed brick.

Q. What kind of mortar were all those bricks laid in?

A. In mortar partially mixed with cement.

Q. How many in the upper story were faced with repressed brick?

A. Seventy-six thousand, six hundred and ninety-five, both sides.

Q. How about the balance in the upper story?

A. Sixty-nine thousand, seven hundred and twenty-six faced on one side with repressed brick.

Q. What kind of mortar were all those bricks laid in?

A. They were all laid in cement mortar.

Q. How much total in money did that contract come to, if you have it figured?

A. I figured it at $5,296.56.

Q. How much pay have you received on that contract?

A. I have received $3,700.

Q. Is the remainder unpaid?

A. It is; $1,596.56.

On cross-examination by Mr. Foss, the witness stated that he had the contract for putting in the foundation of the Ladies' Hall; that he commenced work on the foundation in October, 1883, and completed it about June 10, 1884; was working on it at the time he made the contract for the brick work hereinbefore stated; that in the fall of 1883 he sold to the building committee of Doane College 100,000 brick to be used on the construction of Ladies' Hall.

Q. When you built this foundation, was it made for the purpose and fit for putting buttress wall upon?

A. When it was completed; but we changed the foundation in the spring to make those buttresses. That delayed the foundation till June. If the change had not been made we would have got through in April.

Q. It was changed for the buttressed work?

A. Yes, sir.

Q. The original plan for the foundation did not show that it was made for buttresses?

A. No, sir.

Q. Was not the original plan of the foundation there all the time?

A. Yes, sir; I had it. We had to put in little corners to meet those stone, and the old foundation was torn up and put in again. Those buttresses were put in after that.

*　*　*　*　*　*　*　*　*

Q. You say he had no plans?

A. No, sir; he didn't have any.

Q. You entered into this contract without seeing any plans at all?

A. Yes, sir.

Q. How long have you been in the contracting business?

A. Seven or eight years. * * *

Q. You entered into the contract without any plans of the buildings?

A. I did. I took the men's word for the kind of work and amount of brick, of course.

Q. You based that upon the estimate of 275,000 brick to go into the building?

A. I did.

Q. Without a reference to any height?

A. Yes, sir.

Q. You had to put that in so that the walls would be thick enough for that much?

A. Yes, sir.

Q. You say that it was worth three dollars per thousand

more to put the brick in the third story than in the first and second story?

A. I do, in that building.

Q. How much more did you have to pay your masons for putting those brick in the third story?

A. I didn't pay them any more per day.

Q. How much more per day did you pay your tenders than you did in the first and second stories?

A. I think it was fifteen cents per day more than the other, and I think it was twenty-five cents.

Q. What men did you pay that to?

A. To the laborers.

Q. Do you swear that you paid the carriers and tenders fifteen and twenty-five cents per day more upon the third story?

A. I do.

Q. How many more tenders did it take?

A. It took mighty near twice the amount to carry the brick and mortar.

Q. How many tenders for each mason for the first and second stories?

A. I don't remember just how many I had.

Q. You don't know how many you had for the third story?

A. I know I had to have more, or they could not have laid the brick.

Q. You say you didn't pay your masons any more for the third story than on the first and second?

A. Not per day; but the brick-layers could not lay as many brick per day as in the first and second stories. I know they can't get as many brick laid upon the third story. They were further up, and were not in shape to lay them as quick.

By the court: State whether that alteration was made before or after the contract was made?

A. Quite a number of them afterwards.

[The defendant's objection to the question was overruled by the court, and exception taken.]

Q. You say you learned there was to be a third story put upon this building between July first and tenth?

A. Yes, sir.

Q. That is the first time you knew of that?

A. Yes, sir.

Q. I will call your attention to the testimony in this case before; and didn't you testify that you learned of it in April, when the brick-layers ·first came to work upon this building, and told you that it was to be a three-story job, and that they wouldn't take the job?

A. I learned it from them, but I didn't learn it from Col. Doane.   When I tried to find it out I couldn't find it out; and the brick-layers that I let the contracts to came to do the work some time in May, and they went to Mr. Doane and found out there was a third story; and they came to me, and I said, No; it can't be.   It is only to be a two-story building.   And I went to Mr. Doane, and he said those men didn't want to work; "You had better get some one else to do the work;" thus intimating that there was to be only two stories.

Q. Did you at that time consult the plans of the building?

A. No, sir; I don't know whether there was any there or not.

Q. Did you ever ask him to see the plans of the building?

A. No, sir.

Q. As a matter of fact the masons had the plans of the building to work from?

A. They might have done so.   I was not there much.

Q. Who did have charge of your building?

A. Goering and ———.

Q. Who else?

A. I don't think of any one else.

Q. Did Mr. Malone have charge of the brick-work?

A. They said he did. He was digging ditches more than anything else, I think. He was put there to have charge of the work.

Q. The work was done under his directions?

A. As far as I know I think Mr. Doane did the most of the directing. I was not there much myself. I could not say. I was there once a week, or something like that.

The plaintiff being recalled before the close of the evidence, was further examined as follows:

Q. What, if anything, did Col. Doane say to you about the plans at the time you signed the contract up at Lincoln?

A. When I asked the colonel about the number of brick that there were to be put into the building, he said there were two hundred and seventy-five thousand; that he had no plans with him; that he had left them—I think it was in Milwaukee—to be figured on, and that was his estimate. Of course I based my figures upon the two hundred and seventy-five thousand brick, just what he told me.

The plaintiff was cross-examined as follows:

Q. You say that Mr. Doane told you about these plans? You say he said they were in Milwaukee?

A. I think he said Milwaukee. He said they were having them figured on back east.

Counsel for plaintiff in error in the brief say in the introduction that "In arriving at a decision of the questions which are involved in this case, the court will have to decide the following matters:

"1. To construe the contract for the building of said Ladies' Hall, between John Lanham and Doane College; that is, to determine whether it was a contract; if so, whether it was complete in and of itself.

"2. To put a legal construction upon the memorandum

of agreement to submit all matters in dispute to arbitration.

"3. To decide whether the decision of the arbitrators is final and binding between the parties."

I will first examine the proposition numbered 2 above. But in placing a construction upon the memorandum of agreement to submit all matters in dispute to arbitration, we find at the outset that we are in a great measure relieved of this duty by the defendant having placed a construction thereon, which construction was followed by the trial court in its instructions to the jury, and acquiesced in by the plaintiff. The defendant did not plead the submission of and award upon "all matters of difference," in its answer, as a bar to the action; but, as was understood by the trial court, and as I think, correctly, it pleaded the submission to and the award of the arbitrators, upon certain matters of difference between the parties as a counter-claim or set-off, leaving the plaintiff's cause of action as set out in the petition to be met by the denial, and other allegations of the answer. We need spend no time, therefore, in considering whether it is the true construction of the memorandum of agreement that all differences between the parties should be submitted to arbitrators or not. What was submitted primarily must of course be gathered from the language of the articles or memorandum of submission. By reference to the agreement to submit, the language seems sufficient to embrace all of the matters mentioned in the plaintiff's petition, if they constituted points or "items of difference between the parties, as to work to be done or material to be furnished," as well as "for damage for alleged delay" under the contract for the erection of said Ladies' Hall. But it seems that the language of the agreement to submit was deemed to be too general, hence the memorandum which it is testified was made by a member of the building committee of the defendant in the presence of the plaintiff, and, it is alleged, with his ap-

proval.   A fair construction of the language of this memorandum limits the submission to the items of stone for the building, freight upon stone for the building, setting stone steps, and damage for delay in completing the contract beyond July 15.   Whether the plaintiff would be held to be bound by this limitation or not, the evidence leaves no room for doubt that the defendant is.

The exigencies of the case do not require a lengthy discussion of the law of arbitration and award, to arrive at a conclusion as to the legal force and effect of the award in this case.   Without following the cases or authorities cited by counsel, it will be assumed to be the law, as contended for by counsel for the plaintiff in error in the brief, that "A written submission may be extended without writing at the hearing, by mutual consent, to include additional matters;" and I think that it may be added that "the submission by both parties of such matters, and of evidence concerning them, without contemporaneous objection," is evidence of such intention.   But in the case at bar there is an entire want of evidence of an extension of the submission either with or without writing, or by the submission, by both or either party of evidence concerning any matter outside of the items or matters of difference specified in the memorandum above referred to.   I assume it also to be the law that where an award consists of several distinct and severable items or differences, some of which are within the agreement or articles of submission, and some of which are without the same, either as originally submitted, or as extended as above, it may be sustained as to those items or points of differences within the submission, and rejected as to those without.

In the case at bar, the award does not embrace or extend to the item of stone for the building, nor to the item of freight upon stone for the building.   By its terms the plaintiff is relieved of any and all claims of the defendant upon him under the contract for setting stone steps.   The

items of "loss by freezing cistern water, etc.," for which the arbitrators made an allowance of $100, and of "twelve weeks' services of J. W. Malone, at $35.50 per week, amounting to $426, against the plaintiff, not being embraced in the memorandum of submission, and there being no evidence of an extension of the submission to cover such items, by both parties, in the manner above indicated, but on the contrary the fact of such extension being negatived by evidence on the part of the plaintiff, such items of the award must be rejected as without the scope of the award. The defendant's counter-claim must be held, therefore, to be sustained by the evidence to the extent of $593.34, the amount awarded to defendant for actual loss at the rate of $1.87½ per room per week for each of the thirty rooms mentioned in Mr. Doane's statement, counting from beginning to end of fall term, rent on all rooms not occupied; total amount, $675, less deduction of penalty five days at rate $100 per week, $81.66.

I now approach the task of putting a construction upon the contract for the building. This contract by its language, assumes that the general character, including the length, depth, and elevation, of the proposed building, was known to the contracting parties. No plan of the building is referred to as being then present, nor as having been seen by the contractor, nor as being contemplated by him, nor as governing the price of the material or labor necessary to the execution of the contract. Indeed, as I understand it, no general plan of the building to be erected, is referred to in the contract at all. The only reference to a plan or plans contained in the contract is in the following words: "All work done is to conform to plans, to be furnished and be done under the supervision of the master mason to be appointed by the building committee, and to their entire satisfaction and acceptance. * * * The college agrees to provide the necessary plans of the work to be done." This language, doubtless, refers to the working plans, or

drawings showing the details of the work, and not necessarily nor ordinarily giving any information as to the height of the building, or the number of stories of which it should consist; and even these plans are not spoken of as having been seen by either of the parties, or even as having been drawn or prepared at the date of said contract. In so far, then, as its language is concerned, this is not a contract to erect a building of any specific height. This being the case, and it appearing from the pleadings that the price of the mechanical work and labor was agreed upon by the plaintiff when he joined in the execution of the said contract in view of the building to be erected being but a two-story building, and that the mechanical work and labor necessary to the erection and completion of the three-story building which he was required to erect by the building committee of the plaintiff, pursuant to the stipulations of said contract, and which he did in fact erect and complete, was reasonably worth more than the mechanical work and labor necessary and sufficient to the erection and completion of a building of two stories only, according to the stipulations of the said contract, and such allegations of the petition being traversed and denied by the answer, it became and was necessary and proper on the part of the trial court to let in and admit testimony showing the facts existing at the time of the execution of the contract, and the circumstances of the parties, and of the building, and of its foundation then partly completed, as well as of the other buildings of the college, of which the building erected under the contract constituted a component part; and it was the duty of the jury to find from the evidence whether the plaintiff entered into the said contract in view of the erection and of being required to erect a building of two stories only, and if so, whether the mechanical work and labor necessary and actually bestowed upon the erection of the three-story building that was erected, was worth more, and how much more, per thousand bricks, upon the principle of measure-

ment and compensation fixed and agreed upon in the contract, than the mechanical work and labor necessary to the erection of a building of the same dimensions and workmanship, but of two stories only.

My limited time and space forbid my indulging in a review of the evidence or of the instructions. But an examination of the evidence herein reported will leave no room for doubt that there was sufficient before the jury to warrant them in finding that the plaintiff contracted and was in a sense justified in contracting in view and contemplation of the erection of a building of two stories only. The plaintiff, when on the stand as a witness in his own behalf, testified that at the time of the execution of the contract, Colonel Doane, who acted throughout the transaction on behalf of the building committee of Doane College, stated to him that * * * "he had no plans with him, that he had left them, I think it was in Milwaukee, to be figured on — he said they were having them figured on back east." He further testified that he never saw a plan of the building showing it to be three stories high, during the entire progress of the work, and that when he learned from his brick-layers that it was to be a three-story job, he went to Colonel Doane and told him what the men said; that thereupon he replied; "Those men don't want to work; you had better get some one else to do the work." It is true that all of this evidence is contradicted by that of a witness on the part of the defendant. But the right as well as the duty of deciding upon conflicting testimony, is with the jury, and will not be controlled by any appellate court.

It appears from the bill of particulars that at the time of the execution of the contract, the plaintiff was engaged, under another contract with the defendant, in constructing the stone foundation for the building to be known as "Ladies' Hall." This foundation, it appears, was originally not constructed with buttresses, but some time in the spring

he was required to take out the corners and rebuild them, providing for buttressed walls, which he did. The evidence leaves it in doubt whether this change was made before or after the execution of the contract for the erection of the building. If it was made after the execution of the contract, then there having been no plan of the building before the minds of the parties, they must be presumed to have contracted with reference to a plain and not a buttressed building; and the plaintiff having been required by the building committee of the defendant to build and having built a buttressed building, he would be entitled to the additional compensation which according to the evidence was earned by the builder in consequence thereof. And while, as above stated, the evidence leaves it somewhat in doubt whether the change in the form of the foundation was made after the execution of the contract, yet after verdict such doubt will be solved to the upholding of the finding of the jury. The evidence of the plaintiff is to the effect that the mechanical work, skill, and labor, of building the third-story walls, was worth three dollars per thousand brick more and in excess of the cost per thousand brick of building the first and second stories of the same building, and that there were 189,401 brick in the third story, making $568.20; also, that the cost and a fair compensation for erecting the brick-work of said building, buttressed at the corners as the same was required to be built by the building committee of the college, and was built by the contractor, was thirty dollars more and in excess of the worth and a fair compensation for building it with plain corners.

There was also evidence before the jury — that is to say, the testimony of the plaintiff — that there were placed in the walls of said building by the plaintiff in all 458,000 brick; that 122,513 of said brick were laid in the wall faced on both sides, or were refaced brick, and that 335,487 were faced on one side only, and were repressed brick. Also, that the whole of said brick were laid in cement mortar.

Under the terms of the contract, the above quantities of brick laid in the above proportions, and all laid in cement mortar, would come to $5,168.60. Add to this the above sums of $568.20 and $30, and we have a grand total of $5,766.80. Deduct from this sum the sum of $3,700, which the plaintiff acknowledges in his testimony to have received on the contract, and it leaves $2,066.80. Deduct $593.34, the amount of defendant's counter-claim or set-off, allowed as above, and it still leaves $1,473.46. The, verdict of the jury being within this amount, it is sustained by the evidence.

The judgment of the district court is therefore affirmed

JUDGMENT AFFIRMED.

THE other Judges concur.